# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

      Plaintiff,

v.                                                         No. CR 17-2583 JCH

DAVID LUNA-GOMEZ,
aka Sergio Sauzameda,

      Defendant.

## MEMORANDUM OPINION AND ORDER

On June 4, 2018, Defendant David Luna-Gomez ("Defendant") filed a Motion to Suppress Evidence Obtained as Fruit of an Illegal Title III Wiretap (ECF No. 81). The Government argues that Defendant's motion should be denied without an evidentiary hearing. The Court, having considered the motion, briefs, arguments, evidence, and applicable law, concludes that Defendant's motion does not require an evidentiary hearing, it can be resolved on the submissions of the parties, and it should be denied.

**I.    BACKGROUND**

On May 20, 2016, Senior United States District Judge James A. Parker authorized the interception of wire and electronic communications over phone number (850) 503-8440 ("Romero Phone 4"), allegedly used by co-defendant Orlando L. Romero, for a period of 30 days. *See* Gov.'s Ex. 2 ("Romero Phone 4 Order"), ECF No. 86-2. Judge Parker's Order was based on the Affidavit submitted by Drug Enforcement Administration ("DEA") Task Force Officer Adam Gaitan. *See* Gov.'s Ex. 1 ("Romero Phone 4 Affidavit"), ECF No. 86-1. According to the Romero Phone 4 Affidavit, Officer Gaitan believed the phone was being used to facilitate offenses involving the

distribution of heroin and methamphetamine, among other narcotics and money laundering offenses, and that Orlando Romero was the highest leader/organizer for the drug trafficking organization. *See id.* ¶¶ 8-12.

After interception of Romero Phone 4 ceased on or around June 14, 2016, Special Agent David Howell submitted an affidavit to Senior Judge Parker in support of an application for an order authorizing the interception of wire and electronic communications over (505) 780-9298 ("Luna-Gomez Phone 1"). *See* Gov.'s Ex. 3 ¶¶ 5, 13, 114 ("Luna-Gomez Phone 1 Affidavit"), ECF No. 86-3. Senior Judge Parker issued an order on July 7, 2016, authorizing the interception of wire and electronic communications over Luna-Gomez Phone 1 for a period of 30 days. *See* Gov.'s Ex. 4 ("Luna-Gomez Phone 1 Order") at 5, ECF No. 86-4.

A federal grand jury returned a three-count indictment charging Defendant Luna-Gomez with two counts: (1) conspiracy to distribute 50 grams and more of a mixture and substance containing methamphetamine from on or about May 23, 2015 and continuing to on or about December 19, 2016; (2) conspiracy to distribute 1 kilogram and more of heroin from on or about June 1, 2016, and continuing to on or about June 22, 2016. Defendant has moved to suppress evidence derived from the interceptions of Romero Phone 4 and the spin-off interceptions from Luna-Gomez Phone 1, arguing principally that the affidavit supporting the interception of Romero Phone 4 lacked the necessary information to establish probable cause that voice communications related to enumerated offenses would be intercepted on that phone.

**II.     STANDARD**

Congress passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, ("Title III"), to prohibit all interceptions of oral and wire communications, except those specifically provided for in the Act, such as interceptions authorized by court order

in connection with law enforcement investigation of the serious crimes listed in § 2516. *See United States v. Giordano*, 416 U.S. 505, 514 (1974), *superseded by statute on other grounds as stated in United States v. Anderson*, 39 F.3d 331, 339 n.6 (D.C. Cir. 1994)). Title III requires a judge to find probable cause before issuing an order authorizing interception of communications, "and it sets forth other detailed requirements governing both the application for a wiretap and the judicial order that authorizes it." *Dahda v. United States*, 138 S.Ct. 1491, 1494 (2018) (citing 18 U.S.C. § 2518).

Section 2515 provides that no parts of any intercepted wire or oral communication and no evidence derived therefrom may be received at trial "if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. Not every deficiency in a wiretap application warrants suppression. *United States v. Foy*, 641 F.3d 455, 463 (10th Cir. 2011). Section 2518(10)(a) sets forth the disclosures that are forbidden and subject to motions to suppress evidence: (i) the communication was unlawfully intercepted; (ii) the authorizing or approval order was facially insufficient; or (iii) the interception was not made in conformity with the order of authorization or approval. *Giordano*, 416 U.S. at 524-25 (quoting 18 U.S.C. § 2518(10)(a)).

The Supreme Court interpreted "unlawfully intercepted" in subparagraph (i) to refer to constitutional violations as well as "where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Id.* at 527. Subparagraph (ii) applies where an order is "insufficient on its face," but it does not cover every error that appears in an otherwise sufficient order. *Dahda*, 138 S.Ct. at 1498 (quoting 18 U.S.C. § 2518(10)(a)(ii)). Subparagraph (ii) "covers at least an order's failure to include information that § 2518(4) specifically requires the order to contain." *Id.* "And where the Government fails to comply with conditions set forth in the authorizing order, an

3

aggrieved person may suppress its fruits under subparagraph (iii) (as an 'interception ... not made in conformity with the order of authorization or approval')." *Id.* at 1500.

A judge's interception authorization order under Title III "is presumed proper, and the defendant bears the burden of overcoming this presumption." *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997). In the Tenth Circuit, a court reviewing a finding of probable cause for a wiretap uses the same standard as for a search warrant, determining "whether the facts and circumstances within the officer's knowledge based on reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has or is being committed." *United States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990). Courts give "great deference" to the issuing judge's probable cause finding and consider only whether, under the totality of the circumstances presented in the affidavit, the judge had a "substantial basis" for determining that probable cause existed. *United States v. Haymond*, 672 F.3d 948, 958-59 (10th Cir. 2012) (internal citations omitted).[1] Courts should interpret affidavits supporting warrants in a commonsense manner. *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

### III. LEGAL ANALYSIS

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Title III requires an

---

[1] Defendant submits that the proper standard of review should be that set forth by the Eighth Circuit in *United States v. Gaines*, 639 F.3d 423, 430 (8th Cir. 2011) (concluding that its review of a district court's factual determinations is for clear error and its review of district court's legal conclusions is *de novo* but "existence of probable cause is a mixed question of law and fact that we review *de novo*"). Def.'s Reply 2 n.1, ECF No. 87. Defendant, however, recognizes that the Tenth Circuit has settled the issue within this circuit: "With respect to probable cause, the reviewing Court is to determine whether the judge had a 'substantial basis' for determining that probable cause existed as to the interception of wire communications." *Id.* at 2. Because the Court concludes that the affidavit set forth sufficient information to establish probable cause for both wire and electronic communications under either standard of review, the Court need not consider the appropriate standard, even assuming it were not foreclosed by Tenth Circuit precedent.

application for an order authorizing the interception of "a wire, oral, or electronic communication" in writing, upon oath or affirmation, to a judge and must include, among other things:

> (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) *a particular description of the type of communications sought to be intercepted*, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;….

18 U.S.C. 2518(1) (emphasis added). The judge may approve the application if he determines on the basis of the facts in the affidavit that

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
>
> (b) *there is probable cause for belief that particular communications concerning that offense will be obtained through such interception*;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

*Id.* § 2518(3) (emphasis added).

Congress amended Title III to prohibit the interception of "electronic" as well as oral and wire communications and to apply to conversations intercepted over both cellular and cordless phones. *Bartnicki v. Vopper*, 532 U.S. 514, 524 (2001) (citing Electronic Communications Privacy Act of 1986, 100 Stat. 1848, and 1994 amendment, 108 Stat. 4279, respectively). The Act defines the three classes of communications as follows:

> (1) "wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce;
>
> (2) "oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication; …
>
> (12) "electronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include—
>
> (A) any wire or oral communication…
>
> (18) "aural transfer" means a transfer containing the human voice at any point between and including the point of origin and the point of reception….

18 U.S.C. § 2510(1), (2), (12), and (18). A telephone conversation is a wire communication under Title III. *United States v. Axselle*, 604 F.2d 1330, 1334 (10th Cir. 1979). The parties agree that text messages are electronic communications. *See* Def.'s Mot. 6, ECF No. 81; Def.'s Ex. B (United States Department of Justice Criminal Resource Manual §28(B) (listing text messages as a form of "electronic communications"), ECF No. 81-2.

Defendant argues the Romero Phone 4 Affidavit does not support a finding of probable cause for the interception of wire communications because, although there may have been evidence of *electronic* communication to commit an enumerated offense, there was no evidence that Romero Phone 4 was used for *wire* communications to commit an enumerated offense. Defendant asserts that the affiant was required to show probable cause that wire communications concerning an enumerated offense would be obtained by intercepting the phone. Defendant also contends that the affiants misrepresented numerous facts in both the Romero Phone 4 and Luna-

Gomez Phone 1 affidavits, facts which must be excised from the affidavits, and that the resulting affidavits lack probable cause.

## A. Romero Phone 4 Affidavit

### 1. Particularity

Defendant first argues the wiretap did not satisfy the particularity requirements because it did not set forth with particularity a description of the wire conversations to be seized. Def.'s Reply 8, ECF No. 87. In the wiretap context, the Fourth Amendment's specification requirements "are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. 413, 427 n.15 (1977). It is not, however, a constitutional requirement "that all those likely to be overheard engaging in incriminating conversations be named." *Id.* Consequently, specification identifies "the person whose constitutionally protected area is to be invaded rather than 'particularly describing' the communications, conversations, or discussions to be seized." *Id.* (quoting *Berger v. New York*, 388 U.S. 41, 59 (1967)).

Officer Gaitan's affidavit stated with particularity the communications he sought to intercept: "for a thirty-day period, wire and electronic communications to and from the cellular telephone used by Orlando Lawrence Romero ('Romero') and bearing the Mobile Equipment Identifier (MEID), A0000048FE0D52, currently assigned telephone number (850) 503-8440 ('ROMERO PHONE 4')." Romero Phone 4 Affidavit ¶ 5, ECF No. 86-1. The application also listed the persons expected to be intercepted and explained why Officer Gaitan believed each was involved in narcotics crimes with Romero. *See id.* ¶¶ 12-21. As discussed more thoroughly *infra*, Officer Gaitan gave sufficient facts to establish probable cause to justify both wire and electronic interception of Romero Phone 4. The totality of the facts set forth in the affidavit satisfy the

particularity requirements of the Fourth Amendment and Title III. *Cf. United States v. Gaines*, 639 F.3d 423, 433 (8th Cir. 2011) (holding that affidavit and order met Fourth Amendment particularly requirement because it identified particular telephone line to be tapped and asserted existence of probable cause that communications to be seized would concern drug trafficking).

### 2. Misrepresentations under *Franks*

It is a violation of the Fourth Amendment for an affiant to knowingly and intentionally, or with reckless disregard for the truth, include false statements or make material omissions in an affidavit supporting a search warrant. *United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001) (quoting *Franks v. Delaware*, 438 U.S. 154, 155 (1978)). A defendant must satisfy a two-prong test to be entitled to a *Franks* hearing and suppress fruits of the search: (1) the defendant must make a substantial showing that a false statement was knowingly, intentionally, or recklessly included in the affidavit or that a material omission was knowingly, intentionally, or recklessly excluded from the affidavit; and (2) the false statement was necessary to a finding of probable cause or the omission, if included, would have negated probable cause. *See id.*

Discussing the circumstances necessitating an evidentiary hearing, the Supreme Court further explained in *Franks*:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks*, 438 U.S. at 171-72.

Defendant argues that in Paragraphs 37 and 38 of the affidavit, Officer Gaitan misrepresented having had a conversation with Romero over Romero Phone 3. In the affidavit, Officer Gaitan stated:

> 37. On February 1, 2016, Romero contacted me again from telephone number ROMERO PHONE 3 *via text message* on my UC telephone number (505)807-9417. The following is a transcript *of my text conversation* with Romero:….
>
> 38. Agents have confirmed the male communicating with me on ROMERO PHONE 3 is the same person, Romero, based on context and content of the conversation, *and voice familiarity*.

Romero Phone 4 Aff. ¶¶ 37-38, ECF No. 81-1 (italics added). Defendant asserts that, because Officer Gaitan discussed a text message conversation, he misrepresented that agents were able to identify the person communicating with him based on "voice familiarity." Defendant thus contends that the statement "the male communicating with me on Romero Phone 3 is the same person, Romero" is unreliable and must be stricken. Def.'s Mot. 14, ECF No. 81.

The Court finds that the issuing judge would not have been misled as Defendant urges. The affiant made clear multiple times that the February 1, 2016 communication was by text message only, so the reference to voice familiarity from the text message was clearly a mistake. The totality of the affidavit, however, showed that the affiant communicated with the user of Romero Phone 3 using both voice calls and text messages in prior communications, culminating in a direct drug purchase from Romero, so the statement that agents confirmed the male communicating by text on Romero Phone 3 was Romero was based on multiple prior text messaging and voice calls over the phone and direct contact, not from just the one text message. The Court therefore does not believe that Paragraphs 37 and 38 contain a false or misleading statement that was knowingly, intentionally, or recklessly made. Nor is the allegedly false phrase necessary to the determination of probable cause, as discussed below. The Court therefore will not strike Paragraph 37 or 38 under

*Franks* and no hearing on this issue is necessary. Moreover, even if the Court were to excise the phrase "voice familiarity," its elimination would not affect the issuing judge's nor this Court's probable cause finding.

## 2. Probable Cause

Section 2518(3) requires a finding that "there is probable cause for belief that particular communications concerning the offense will be obtained through interception." The probable cause standard is whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Tisdale*, 248 F.3d at 970 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The test for reviewing probable cause when issuing a search warrant is "whether the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched." *Id.* at 971-72 (internal quotation omitted).

Defendant argues that, while the affiant used text and phone conversations to communicate with Romero using Romero Phone 2 and Romero Phone 3, he only used text messages to communicate with Romero over Romero Phone 4. *Compare* Romero Phone 4 Aff. ¶ 39 (describing text conversation on Romero Phone 3 and voice phone conversation on Romero Phone 2 regarding purchasing heroin and meth), *and* ¶ 40 (describing text and voice phone conversations over Romero Phone 3 to negotiate heroin purchase); *with* ¶ 41 (describing text message affiant received from Romero Phone 4 describing future narcotics purchases). In the text message, Officer Gaitan, using an undercover phone, texted to Romero Phone 4 if he could get "haf of th shard" (translated by the affiant to mean "half pound of methamphetamine"), to which the suspect responded, "Yeah but its going to be 5000 because its half" (translated by the affiant as "Yeah, but it is going to cost $5,000 for a half pound"). *Id.* ¶ 41. The text messages then involved negotiating the price. *See id.* The information in the affidavit established probable cause that the suspect used Romero Phone 4

to facilitate drug trafficking activities through text messaging, a point Defendant essentially concedes. *See* Def.'s Mot. 15, ECF No. 81 ("While affiant arguably established probable cause that TT1 (Romero Phone 4) was utilized to facilitate drug trafficking activities through text messaging only…").

Moreover, Officer Gaitan stated why he believed that the text message he received from Romero Phone 4 on April 23, 2016, was Orlando Romero: the person used similar coded words to those used in his previous conversations with Romero, the person's first text from this new number used an almost identical greeting to the first text sent on Romero Phone 3, the person referenced a mutual friend, the person called him by his UC name, and his word choice and spellings are very similar to previous text conversations over Romero Phones 1, 2, and 3. Romero Phone 4 Aff. ¶¶ 41-42, ECF No. 86-1. Officer Gaitan explained that, while in an undercover capacity, he purchased narcotics directly from Romero four separate times, and he arranged each of those transactions by contacting Romero on his personal cell phones. *Id.* ¶ 34. He further described how Romero changed his cell phone numbers every two to three months, and he used both text message and voice calls to communicate with Romero over Romero Phones 1, 2, and 3 to arrange narcotics purchases. *See id.* ¶¶ 35-40. Officer Gaitan provided transcripts of certain text messages and voice calls, specifying which part of the conversation was by text and which by voice. *See id.* ¶ 36 (text and voice calls over Romero Phone 3 in January 2016), ¶ 39 (text over Romero Phone 3 and voice call over Romero Phone 2 to arrange narcotics transactions on March 9, 2016); ¶ 40 (text on March 31, 2016, over Romero Phone 3 to negotiate heroin purchase; text and voice call on April 1, 2016 over Romero Phone 3 regarding heroin transaction; and statement that affiant purchased 3 ounces of heroin directly from Romero on April 1, 2016 after call).

Although the affidavit does not state that Officer Gaitan engaged Romero in a voice call over Romero Phone 4, the affidavit shows that Officer Gaitan engaged Romero in both voice calls and text messages over prior phones regarding narcotics transactions, and thus, he had reason to believe continued narcotics transactions likely would occur via text messages *and* phone calls over new phones used by Romero. This analysis is not one of simply transferring probable cause from earlier phones to another phone; rather, Officer Gaitan provided in his affidavit particularized evidence that Romero Phone 4 was used to facilitate drug trafficking via text messaging and why there was reason to believe, based on the suspect's recent past practice, that he would likely use the phone for voice communication as well. The affidavit established separate probable cause for each form of communication sought – wire and electronic.

Defendant's argument that a "dirty call"[2] on Romero Phone 4 is a prerequisite to establish probable cause to intercept voice calls on Romero Phone 4 is untenable and unsupported by authority. None of the cases Defendant cites holds that a dirty voice call by a suspect is necessary to establish probable cause supporting wire interception for the phone used by that suspect, especially where the suspect has used past phones to make drug transactions via text and voice calls. Defendant cites cases holding that spin-off wiretaps of phones of other conspirators must be supported by affidavits showing probable cause and necessity, among other requirements, but they do not compel suppression here where there was sufficient information to establish separate, independent probable cause for interception of both wire and electronic communication over Romero Phone 4. *Compare United States v. Scurry*, 821 F.3d 1, 16-17 (D.C. Cir. 2016) (holding affidavit demonstrated probable cause that target phone would be used to commit narcotics crimes where cooperating witnesses had months-long history of coordinating drug transactions over prior

---

[2] The Government describes a "dirty call" as a recorded voice conversation regarding drugs. United States' Resp. 1, ECF No. 86.

phone, agents learned suspect acquired new phone, suspect arranged to sell crack to witness over new phone, drug traffickers often switch phones, and toll records showed target phone in contact with phone numbers from prior phone); *with United States v. Santora*, 600 F.2d 1317, 1321-22 (9th Cir. 1979) (holding that affidavit for spin-off wiretap application failed to recite any specific efforts made by agents to investigate alternatives relating to new suspects to make necessity showing).

Moreover, Officer Gaitan averred that he analyzed toll records for Romero Phone 4 from April 13 through April 27, 2016, as well as pen register and/or trap and trace information for Romero Phone 4, and that from April 13 to May 5, 2016, and that there were approximately 519 calls to and from Romero Phone 4. *See* Romero Phone 4 Aff. ¶ 43, ECF No. 86-1. He asserted that there were 809 texts to and from Romero Phone 4. *Id.* ¶ 44. Officer Gaitan explained that his analysis showed 122 calls and 6 texts in contact with a phone likely used by Ashley Snyder-Aragon, 47 calls and 35 texts to a phone likely used by Margaret Perea or to a third-party, 30 calls and 5 texts to a phone likely used by Clayton Arellano, and he connected those three persons to Romero's narcotics activity. *See id.* ¶¶ 45-58. Among other reasons, Officer Gaitan noted that Ms. Snyder-Aragon lived with Romero, agents observed her engaging in counter-surveillance methods, she was arrested alongside Romero in 2010, and she pleaded guilty in 2012 to conspiracy to distribute heroin. *See id.* ¶¶ 48-53. The affidavit also stated that confidential informants identified Mr. Arellano as a heroin distributor for the Los Padillas gang. *See id.* ¶¶ 57-58.

Defendant contends, however, that the Government cannot rely on the Toll Record and Pen Register Data Chart to establish probable cause that wire communications would be intercepted over Romero Phone 4. "A pen register is a mechanical device that records the numbers dialed on a telephone." *United States v. New York Tel. Co.*, 434 U.S. 159, 161, n.1 (1977). "It does

not overhear oral communications and does not indicate whether calls are actually completed." *Id.* Defendant argues that, because the affiant failed to include the time duration or average time duration of the telephone calls, he did not establish that there was sufficient time for a voice communication to have occurred. Similarly, Defendant asserts that the lack of information concerning the number of incoming and/or outgoing telephone calls does not establish that voice communications occurred because incoming calls of a few seconds "would comprise merely of the time in which the telephone would be ringing or otherwise engaged in connection mode." Def.'s Mot. 3, ECF No. 81. The Court disagrees that the toll record and pen register information does not add evidence in the probable cause analysis. That evidence provides additional support that there was a fair probability that the target telephone was used for drug transactions.

"Warrants frequently authorize a search of more than one place, and one set of facts may provide probable cause for both searches." *United States v. Barajas*, 710 F.3d 1102, 1109 (10th Cir. 2013). For all the foregoing reasons, based on the totality of the evidence, viewed in a commonsense manner, the affidavit in support of the application to intercept Romero Phone 4 contained sufficient facts to warrant a person of reasonable caution to believe that evidence of narcotics crimes would be found through the interception of both wire and electronic communications over Romero Phone 4. *Cf. Armendariz*, 922 F.2d at 608 ("There was a substantial basis to find probable cause existed tied both to statements of confidential informants, the results of police surveillance, and the documentation from pen registers in the investigation."). The Court will therefore not suppress evidence derived from the interception of Romero Phone 4.

### B. Luna-Gomez Phone 1 Affidavit

Defendant argues that the affiant made misleading, false statements concerning the arrest and interview of co-defendant Elizabeth Ordonez-Ochoa on June 22, 2016. Paragraph 18 said:

> In a post arrest interview, Ordonez-Ochoa confessed to picking up the heroin from Cervantes-Hernandez in Ciudad Juarez, Chihuahua, Mexico, resting at a house in El Paso, Texas, and then transporting heroin to Albuquerque, New Mexico. She revealed that she had made several such deliveries of heroin before, and her statement[s] were consistent and contact numbers were consistent with deliveries both to Luna-Gomez and Villanueva.

Aff. ¶ 18, ECF No. 81-6. Later, the affiant stated in Paragraph 56:

> Ordonez-Ochoa admitted she was attempting to deliver the five pounds of heroin to the auto shop located at 701 Coors Boulevard NW, Albuquerque, New Mexico. That is the same auto shop where Villanueva supplied Romero methamphetamine on June 1, 2016. Ordonez-Ochoa also provided a contact phone number of (505) 414-8397 that she was supposed to contact when she arrived in Albuquerque. Notably, Luna-Gomez claimed this same phone number as his own on gym membership application for an Albuquerque-based gym….

*Id.* ¶ 56. Finally, in Paragraph 58, In Paragraph 58, the affiant said the following:

> Specifically, intercepted communications over ROMERO PHONE 4 have confirmed Luna-Gomez as a source of supply for methamphetamine and/or heroin for Romero, who has sold several times to DEA agents working in an undercover capacity. That belief has been further corroborated by the recent arrest of Ordonez-Ochoa who provided information indicating that she delivered loads of heroin to Luna-Gomez in Albuquerque.

*Id.* ¶ 58.

Defendant asserts that the DEA report of Ms. Ordonez-Ochoa's interview indicates that she did not identify Luna-Gomez by name or alias, through photographic identification, or physical description; instead, she identified previous recipients of heroin as "Emilio" and "El Viejon." Defendant argues that, because Ms. Ordonez-Ochoa did not identify Luna-Gomez as a recipient of previous heroin shipments or the intended recipient of the heroin seized on June 22, 2016, the affidavit contained significant misrepresentations.

Special Agent Howell explained in his affidavit that a series of drug related conversations were intercepted over Romero Phone 4 between Romero and an unknown male who agents later identified by comparing surveillance photos of the suspect to a local gym membership card that

15

contained a matching photograph and the name "David Luna Gomez." *See* Luna-Gomez 1 Aff. ¶¶ 13, 20, 28-37, 40-41, 38-41, 52-55, ECF No. 86-3. Special Agent Howell also described communications intercepted over Romero Phone 4 in which Romero had coded conversations with a man, later identified via surveillance photographs and a driver's license photograph as Emigdio Villanueva, about buying drugs from Villanueva. *See id.* ¶¶ 14 & n.6, 36, 42-51. Some of the conversations also mentioned Villanueva's shop. *See id.* ¶ 14, 36, 41. Agents linked Villanueva to a car shop in his name at 701 Coors Boulevard. *Id.* ¶ 14 & n.6.

Special Agent Howell detailed intercepted communications on June 5-7, 2016, in which Officer Gaitan initiated conversations with Romero to buy eight ounces of methamphetamine and four ounces of heroin that prompted Romero to communicate with Luna-Gomez over Luna-Gomez Phone 1, during which Luna-Gomez asked if he wanted to "shop with Emilio?" and directed Romero to call his friend. *See id.* ¶¶ 38-41. According to the affidavit, Romero shortly thereafter called Villanueva Phone 1 in which a series of conversations about meeting ensues, after which Villanueva and Romero met, then Romero called Officer Gaitan to arrange to meet him, resulting in Officer Gaitan buying eight ounces of methamphetamine and four ounces of heroin from Romero for $6,900. *See id.* ¶¶ 42-50. Special Agent Howell stated that Romero engaged in a follow-up communication on June 7, 2016, with Luna-Gomez about the quality of the drugs. *See id.* ¶¶ 52-53. Given the totality of the information in the affidavit, there was a fair probability that Luna-Gomez was engaged in drug transactions using Luna-Gomez Phone 1 even without the corroborating information discovered through the June 22, 2016 drug seizure from Ms. Ordonez-Ochoa.

Turning to the June 22, 2016 drug seizure, in Paragraph 18, Special Agent Howell did not state that Ms. Ordonez-Ochoa identified Luna-Gomez; instead, he stated that she said she made

deliveries of heroin before and her statement was "consistent and contact numbers were consistent with deliveries both to Luna-Gomez and Villanueva." Luna-Gomez Phone 1 Aff. ¶ 18, ECF No. 86-3. Paragraph 56 explained the basis for Special Agent Howell's belief that Luna-Gomez was connected to Ms. Ordonez-Ochoa's delivery: Ms. Ordonez-Ochoa admitted she was attempting to deliver the heroin to an auto shop located at 701 Coors Boulevard and gave agents a contact phone number of (505) 414-8397 to contact when she arrived in Albuquerque that was the same as Luna-Gomez's gym membership. *See id.* ¶ 56. Other paragraphs in the affidavit set forth the information agents had connecting the auto shop to Villanueva, connecting the contact number to Luna-Gomez, and regarding the intercepted phone calls indicating that Villanueva and Luna-Gomez supplied drugs to Romero. *See supra* at 16-17. Special Agent Howell further explained that Ms. Ordonez-Ochoa indicated she delivered heroin previously to Albuquerque using a phone number that agents knew was subscribed to "Emigdio Villanueva" and that had been in contact with Luna-Gomez Phone 1 as recently as June 9, 2016. Luna-Gomez Phone 1 Aff. ¶ 56, ECF No. 86-3. The above information gave Special Agent Howell reason to believe that Ms. Ordonez-Ochoa had delivered heroin before to persons in Albuquerque and that Luna-Gomez was one of those persons given her possession of his contact phone number. The Court therefore does not find that Special Agent Howell was deliberately or recklessly misleading in his statement, "That belief has been further corroborated by the recent arrest of Ordonez-Ochoa who provided information indicating that she delivered loads of heroin to Luna-Gomez in Albuquerque." *Id.* ¶ 58. Given the sum totality of the allegations, Senior Judge Parker would not have been misled by the statement in Paragraph 58. Most significantly, even if the statement were misleading, excising the statement in Paragraph 58 from the affidavit would not affect the probable cause determination. As discussed *supra*, based on the totality of the evidence provided in the affidavit and viewed in a commonsense manner, the

affidavit in support of the application to intercept Luna-Gomez Phone 1 contained sufficient facts to warrant a person of reasonable caution to believe that evidence of narcotics crimes would be found through the interception of both wire and electronic communications over that phone. Accordingly, the Court will not suppress evidence derived from the interception of Luna-Gomez Phone 1.

**IT IS THEREFORE ORDERED** that Motion to Suppress Evidence Obtained as Fruit of an Illegal Title III Wiretap (**ECF No. 81**) is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**